CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/17/2022

JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| CROWN PACKAGING TECHNOLOGY, INC., *Plaintiff*, | CASE NO. 6:18-cv-70 |
| v. | MEMORANDUM OPINION |
| BELVAC PRODUCTION MACHINERY, INC., *Defendant*. | JUDGE NORMAN K. MOON |

## MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the parties' motions for summary judgment. Both parties have moved for summary judgment on several issues. Plaintiff (Crown) has filed seven summary judgment motions, each covering discrete issues, Dkt. 120, 121, 123, 125, 127, 128, and 130. Defendant (Belvac) has filed one summary judgment motion covering all the issues on which it seeks summary judgment, Dkt. 117. The issues raised by each party and the Court's decision on whether to grant or deny summary judgment on each of those issues are, in brief:

(1) **Infringement** – Crown moves for summary judgment on infringement, Dkt. 120. The Court will deny this motion.

(2) **Inequitable Conduct** – Crown moves for summary judgment on Belvac's inequitable conduct affirmative defense, Dkt. 121. The Court will grant this motion.

(3) **Indefiniteness** – Crown moves for summary judgment on Belvac's indefiniteness affirmative defense, Dkt. 123. The Court will deny this motion.

(4) **No Derivation** – Crown moves for summary judgment on Belvac's derivation affirmative defense, Dkt. 127. The Court will deny this motion.

(5) **NC-10 Necker** – Crown moves for summary judgment on Belvac's affirmative defense relating to the NC-10 Necker, a third-party necking machine, Dkt. 128. The Court will deny this motion.

(6) **On-Sale Bar** – Both parties move for summary judgment on Belvac's on-sale bar affirmative defense. The Court will grant Crown's motion on the issue, Dkt. 125, and deny the portion of Belvac's motion on the issue, Dkt. 117.

(7) **Lack of Written Description** – Belvac moves for summary judgment on the invalidity of the asserted patents due to the indefiniteness of the written description, Dkt. 117. The Court will deny this part of Belvac's motion.

(8) **Lost Profits** – Belvac moves for summary judgment on the availability of lost profits, Dkt. 117. The Court will deny this part of Belvac's motion.

Crown also filed a motion for summary judgment, Dkt. 130, that it has since withdrawn.

## I.  Background

The facts of the case recited here are repeated from the Court's accompanying opinion on the parties' *Daubert* motions.

This case is a patent dispute relating to aluminum can manufacturing—specifically to the process of "can necking." Dkt. 1 (Complaint). Crown Packaging Technology, Inc., and CarnaudMetalbox Engineering Ltd. (collectively, "Crown") filed a complaint against Belvac Production Machinery, Inc., ("Belvac") alleging patent infringement claims involving three different patents: Crown's U.S. Patent Nos. 9,308,570 (the "570 patent"), 9,968,982 (the "982 patent"), and 7,770,425 (the "425 patent"). Dkt. 1. Belvac filed a counterclaim against Crown alleging patent infringement relating to its U.S. Patent No. 7,530,445 (the "445 patent").

Both parties are in the business of making equipment used to produce two-piece

aluminum beverage cans. Dkt. 1 at ¶ 13. They manufacture two of the most prominent machines for "necking" beverage cans. *Id.* at ¶¶ 13–19. Necking is the process by which can bodies are typically formed—by first drawing and ironing a cylindrical-shaped cup, and then reducing the diameter of the body. *Id.* at ¶ 14. For many years, up to the early 2000s, Belvac dominated the market for necking machines, but in 2004 Crown launched a new machine, the CMB3400, which surpassed Belvac's machines in efficiency. *Id.* at ¶¶ 18–19. Soon after Crown launched the CMB3400, the conflict between Crown and Belvac began, with each claiming that the other was infringing its patents. *Id.* at ¶¶ 20–23.  There were initially two separate litigation disputes between the parties, one in the United States (in the U.S. District Court for the District of Nevada) and the other in the United Kingdom (in the High Court of Justice, Chancery Division). *Id.* at ¶ 25. Belvac filed both cases. *Id.* at ¶¶ 26–27. The U.S. litigation ended with the court dismissing Belvac's claims with prejudice, and the U.K. litigation ended with the court holding in Crown's favor that Crown had not infringed Belvac's patents. *Id.* at ¶ 27.

Then, Belvac developed a new necking machine, known as THE BELVAC. *Id.* at ¶ 31. THE BELVAC bears a similar set of features to the CMB3400, and Crown claims in the present litigation that Belvac infringed its patents in developing and marketing THE BELVAC. *Id.* at ¶¶ 31–32.

## II.   Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show

that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of proving that judgment on the pleadings is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert City*, 48 F.3d 810, 818 (4th Cir. 1995).

### III.   Analysis

#### A.   Infringement

Crown moves for summary judgment on infringement, Dkt. 120. Crown argues that even taking Belvac's description of its machine as true, that Belvac has infringed Crown's patents as a matter of law. Dkt. 168 at 1.

The dispute between the parties boils down to one issue: does that fact that one or two of the dies in THE BELVAC are allegedly non-infringing create a jury issue? Crown argues that

Belvac concedes that it has infringed Crown's patents in all but one way—with respect to the dies used in the first two stages of the necking process in THE BELVAC. Dkt. 168 at 12. Belvac does not agree that it has conceded any part of Crown's infringement claim because Crown "can only prove infringement by showing that [THE BELVAC] 'contains each limitation of the claim, either literally or by equivalent.'" Dkt. 147 at 3 (citing *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005)). Because Belvac does not concede that the necking dies used in the first two stages of THE BELVAC's necking process infringe Crown's patents, it does not concede any infringement. *Id.* Regardless, the parties agree that Belvac has not conceded that the dies used in the first two stages of the necking process infringe Crown's patents. Crown's argument is that THE BELVAC nonetheless infringes its patents as a matter of law because the patent claims read on the entirety of THE BELVAC regardless of the type of die used in the first two stages of the necking process in THE BELVAC. Dkt. 168 at 14–15. Belvac argues in turn that the difference in the first one or two dies at least creates a jury issue about whether it has infringed Crown's patents. Dkt. 147 at 1.

Crown argues that "[b]ecause claim 1 of the '784 patent recites a machine 'comprising' multiple necking stages, the presence of additional, non-infringing stages is irrelevant." Dkt. 168 at 15. Crown cites the Federal Circuit's holding in *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983) that the inclusion of non-infringing features in an otherwise infringing machine does not render the machine non-infringing:

> For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment.

713 F.2d at 703. Because Crown's patent describes a machine that contains "multiple horizontal necking stages" each of which "operate at 3000 cans per minute," which THE BELVAC also

does, then, Crown argues, THE BELVAC infringes Crown's patent as a matter of law. Dkt. 168 at 16.

Belvac argues that it has not infringed Crown's patents as a matter of law because THE BELVAC, in order to "be adapted for necking at least 3000 beverage can bodies per minute," does not include the same first stage (and sometimes second stage) of the necking process as Crown's machine. Dkt. 147 at 9. Belvac's argument, in essence, is that its machine contains a piece of technology, the die it uses at the first and sometimes second stages of the necking process in THE BELVAC, which is clearly *not* covered by Crown's patents, and that the different die used in THE BELVAC is necessary to adapt THE BELVAC to neck "at least 3000 can bodies per minute," as is required by Crown's claim. Belvac notes that the Federal Circuit cases that Crown cites, such as *A.B. Dick* (discussed above) are inapposite because here, unlike in those cases, a piece of technology not covered by the claims—the die used in the first stage of the necking process—"is necessary in order for [THE BELVAC] to meet the limitations of the claims." Dkt. 147 at 9–10.

Under Federal Circuit law, if THE BELVAC does in fact require an "essential" element (the die used at the first stage of the necking process) that is necessary for the machine to be adapted "for necking at least 3000 beverage can bodies per minute" then Belvac might not have infringed Crown's patent. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (discussing the meaning of when elements of a technology "compris[e]" the claim— holding that the elements must be "essential"). Crown's cited cases are inapposite because Crown's cases all revolve around disputes where the allegedly infringing party added additional *non-essential* elements to the patented machine. *See NuVasive, Inc. v. Alphatec Holdings, Inc.*, 445 F. Supp. 3d 972 (S.D. Cal. 2020); *Saffran v. Johnson & Johnson*, No. 2:07-CV-451 (TJW),

2011 WL 195622 (E.D. Tex. Jan. 20, 2011).

It is a jury issue whether a component of an allegedly infringing machine is in fact "essential" (because that question is part of the broader issue of fact of whether the allegedly infringing machine does, in fact, infringe the claim or claims). *See Optivus Technology, Inc v. Ion Beam Applications S.A.*, 2005 WL 6070811 at *20, 23 (C.D. Cal. March 14, 2005). And a reasonable jury might find that the first stage of THE BELVAC's necking process is in fact "essential." Belvac has put forward evidence that the first stage of THE BELVAC's necking process is in fact essential for THE BELVAC to neck "at least 3000 beverage can bodies per minute," including most notably the expert report and deposition of Edmund Gillest, who testified *inter alia* that "you can't make cans at 3,000 cans a minute without the first or second stations being tapered." Ex. 19 to Dkt. 132 at 333:8–10. The Court must construe that evidence in the light most favorable to Belvac, as the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Therefore, the Court will deny Crown summary judgment on infringement.

## B.   Inequitable Conduct

### *1   Background*

Next, Crown moves that the Court grant summary judgment on the issue of inequitable conduct. Dkt. 121. Belvac has raised inequitable conduct as an affirmative defense, alleging that an individual associated with Crown "with a duty of candor to the United States Patent and Trademark Office deliberately withheld a known material reference or made material misrepresentations with specific intent to deceive the Patent Office." *Id.* Belvac alleges inequitable conduct with respect to three of the four asserted patents—the 570 patent, the 982 patent, and the 784 patent (collectively, "The High-Speed Configuration Patents"). Dkt. 146 at

5–11. Specifically, Belvac alleges that Crown knew about Belvac's 795 Necker model, which, like Crown's model "had a saw-toothed configuration, speeds greater than 3,000 CPM, and a stroke length of 1.50 inches," but "intentionally did not disclose the 795 necker to the Patent Office when it initially applied for its patents." Dkt. 146 at 1, 3. And, Belvac argues, "Crown obtained [its] patents as a result of its non-disclosure, and is now suing Belvac for infringement of those patents . . . [so] Crown's patents are unenforceable because of its inequitable misconduct." *Id.* at 3.

### 2. Legal Standard

To prove inequitable conduct based on an omission, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). "Intent and materiality are separate requirements." *Id.* "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.*

On one hand, the Federal Circuit has noted that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Id.* at 1289. On the other hand, the Federal Circuit "urges caution' in making an inequitable conduct determination at the summary judgment stage." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006). "Intent to mislead or deceive is a factual issue that, if contested, is not readily determined within the confines of Fed. R. Civ. P. 56." *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576-77 (Fed. Cir. 1985) (stating that an evaluation of intent "is rarely enabled in summary proceedings").

A finding of inequitable conduct renders the entire patent unenforceable. *Therasense*, 649

F.3d at 1288. "The taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id*. Thus, the Federal Circuit has held continuation patents unenforceable based on the inequitable conduct found in the prosecution of the parent application. *See, e.g., Agfa Corp. v. Creo Prods., Inc*., 451 F.3d 1366 (Fed. Cir. 2006) (continuation patent unenforceable based on inequitable conduct found in the prosecution of the parent application).

### 3.   Duty of Candor and Knowledge

Only inventors and those substantively involved in patent prosecution have a duty of candor to the Patent Office (PTO). *Molins PLC v. Textron, Inc*., 48 F.3d 1172, 1178 (Fed. Cir. 1995). Under the applicable federal regulations, the duty of candor applies to "[e]ach individual associated with the filing and prosecution of a patent application . . . ." 37 C.F.R. § 1.56. "Individuals associated with the filing or prosecution of a patent application" include: (1) each inventor named in the application; (2) each attorney or agent who prepared or prosecutes the application; and (3) every other person who is substantively involved in the preparation or prosecution of the application. 37 C.F.R. § 1.56(c); *see also Molins*, 48 F.3d at 1178 n.6.

The Court must, then, identify which individuals associated with Crown who had a duty of candor to the PTO, if anyone, knew about the 795 Necker. Belvac points to two individuals or sets of individuals on this point. First, Belvac argues that Daniel Egerton, who "work[ed] on the design of Crown's 3400 Necker, learned about the 795 Necker . . . [and] discussed this with the design team." Dkt. 146 at 14. Belvac does not appear to argue that Egerton himself had a duty of candor (and in fact he clearly did not), but argues that he communicated his knowledge of the 795 Necker to the design team and argues that "people credited with inventing the patents that the 3400 necking machine practices were part of that design team." *Id.* Belvac does not specify

9

which inventors, exactly, Egerton communicated his supposed knowledge of the 795 Necker to, but the only individuals Belvac could likely be referring to with a duty of candor to the PTO were Mr. Dunwoody and Mr. Scholey, the inventors named on the application. But Belvac's evidence in the record does not indicate that Egerton communicated his knowledge of the 795 Necker to Dunwoody or Scholey. In Egerton's deposition (the sole piece of evidence that Belvac has put forward to argue that one of the inventors had knowledge of the 795 Necker), Egerton stated that he learned of the 795 Necker, then communicated it to the "design team." Ex. 12 to Dkt. 146 at 58:1–19. The deposition transcript shows that the examining attorney asked Egerton who was included on the design team, and then lists several names, none of which are Dunwoody or Scholey, and then the excerpted portion of the deposition transcript that Belvac has provided cuts off. *Id.* So there is no way to infer from the fact that Egerton knew about the 795 Necker that anyone with a duty of candor also knew about the 795 Necker. Belvac simply has not put that evidence into the record.

The only other individual who Belvac points to as having a duty of candor to the PTO is Crown's patent attorney, Jake Soumis. Dkt. 146 at 14. Crown acknowledges that Soumis was involved in the prosecution of the patents and had a duty of candor to the PTO. Dkt. 179 at 8. Belvac asserts that Soumis knew about the 795 Necker because he disclosed the existence of the 795 Necker in an Invention Disclosure Statement to the PTO in connection with another patent application. Dkt. 146 at 8; Ex. 14 to Dkt. 146.

In short, there are three individuals who the Court can identify from the record as having a duty of candor to the PTO who Belvac alleges knew about the 795 Necker: Dunwoody, Scholey, and Soumis. Belvac has not put forward anything more than speculation that Dunwoody and Scholey knew about the 795 Necker. This just leaves Soumis.

*4.   Withheld Information*

To prove inequitable conduct based on an omission, Belvac must show (*inter alia)* that an individual with a duty of candor withheld information from the PTO. *Therasense*, 649 F.3d at 1290. There is just one alleged piece of withheld information in question: the 795 Necker.[1] Crown acknowledges that no one with a duty of candor disclosed the existence of the 795 Necker to the PTO but argues that the individuals with a duty of candor either had no knowledge of the 795 Necker (Dunwoody and Scholey) or that their failure to disclose the 795 Necker was neither material nor done with intent to deceive (Soumis).

*5.   Materiality*

Inequitable conduct's materiality prong requires proving that the Patent Office would not have allowed a claim had it been aware of the undisclosed prior art. To prove the materiality prong of inequitable conduct, the accused infringer must prove that any undisclosed prior art is "but-for" material, meaning that "the [Patent Office] would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291. The materiality prong ensures that the inequitable conduct doctrine only applies "in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." *Id.* at 1292.

---

[1] The Court also notes that Crown has provided argument on another possible area of inequitable conduct: Crown's supposed failure to disclose the alleged "offer" that it sent Complete Packaging, which is discussed in detail below with respect to the cross-motions for summary judgment on the matter. Dkt. 122 at 18–19. The Court will not address the Crown Packaging "offer" in the inequitable conduct context in detail because Belvac has not provided any argument on the issue, and instead has focused solely on Crown's alleged inequitable conduct with respect to the 795 Necker. *See* Dkt. 146. But even if Belvac had contested the issue, the Court would hold that Belvac has no inequitable conduct defense with respect to the Complete Packaging "offer" because the "offer" was not prior art. *See Preemption Devices, Inc. v. Minnesota Mining and Mfg. Co.*, 732 F.2d 903, 908 (Fed. Cir. 1984) (dismissing an inequitable conduct argument based on references not shown to be prior art); *see also infra*, Part III.F.

Belvac's sole piece of evidence that Soumis knew about the 795 Necker is his disclosure of the existence of the 795 Necker in connection with a different patent application.[2] Dkt. 146 at 8; Ex. 14 to Dkt. 146. Belvac argues that the information pertaining to the 795 Necker was material because "Crown represented to the PTO that the alleged invention in the parent patent application was novel because it had a saw-toothed configuration and speeds over 3000 cpm, and it also claimed a stroke length of at least 1.50 inches," but those specifications were also true of the 795 Necker. Dkt. 146 at 15. But Belvac has not provided any evidence of what, exactly, Crown's representations to the PTO about the novelty of its invention were, so the Court has no way to assess the materiality of the information about the 795 Necker to Crown's applications for the High-Speed Configuration Patents.

Further, and especially critically, Belvac has not put any evidence into the record that Soumis knew that the 795 Necker was material. The Federal Circuit has been clear that the person with a duty of candor must have known that the information was material (i.e., it is not enough that the person knew generally about the information and, separately, that the information happened to be material. The person with a duty of candor has to have had the information *and* known that it was material). *Therasense*, 649 F.3d at 1290 ("the accused infringer must prove . . . that the applicant knew of the reference, [and] *knew that it was material*.") (emphasis added). In other words, the alleged infringer cannot make out an inequitable conduct defense where the person with a duty of candor had the information but did not know that it was material. Here, the extent of the evidence that Soumis knew about the 795

---

[2] The Court does not credit the "evidence" that Belvac has put forward on this point from Edmund Gillest's expert report, because Belvac did not actually show the document to Gillest, so there was no basis for Gillest to determine what it contained. Ex. 9 to Dkt. 122 (Gillest's expert report) at ¶ 699; Ex. 17 to Dkt. 122 (Gillest's deposition) at 205:13–206:4.

Necker is his disclosure of the existence of the 795 Necker in the other patent application, but his disclosure there consisted of just a short snapshot of a website briefly describing the 795 Necker. Ex. 14 to Dkt. 146. Notably absent from the disclosure is any reference to the 795 Necker's specifications that Belvac asserts the High-Speed Configuration Patents shared (the saw-toothed configuration, speeds over 3000 cpm, and a stroke length of at least 1.50 inches). So, while there is evidence in the record that Soumis had some general knowledge of the existence of the 795 Necker, and there is evidence in the record that the 795 Necker might have been material, there is no evidence in the record that Soumis knew of the material aspects of the 795 Necker.

Thus, there is no evidence in the record that that "the applicant knew of the reference, [and] knew that it was material." *Therasense*, 649 F.3d at 1290.

### 6. *Specific Intent*

Inequitable conduct's intent prong requires proving with that an individual with a duty of candor had specific intent to deceive the Patent Office. *Therasense*, 649 F.3d at 1290. A finding that the individual "should have known" or even exhibited gross negligence is not sufficient. *Therasense*, 649 F.3d at 1290.

Belvac has quite simply put forward no evidence on Soumis' intent. Belvac has not even clearly *alleged* that Soumis had specific intent to deceive the Patent Office, instead relying on vague allegations that Crown as a whole had specific intent to deceive. *See* Dkt. 146 at 15–19 (where Belvac posits several scattershot theories for intent). Although it is true that "a district court may infer intent from indirect and circumstantial evidence," *Therasense*, 649 F.3d at 1290, the court must have some evidence, of which there is none here. *See Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1321 (Fed. Cir. 2010) (affirming summary judgment on no inequitable conduct where the alleged infringer failed to produce any evidence to show the threshold level of

intent, but instead relied on an inference of intent because the withheld information was highly material, and because the patentee failed to proffer a credible explanation for why the reference was withheld). Belvac cannot rely on "the building of one inference upon another, or the mere existence of a scintilla of evidence," *Dash*, 731 F.3d at 311, and even crediting the fact that Soumis submitted a reference to the 795 Necker in one patent application but not in the application for the High-Speed Configuration Patents, there is no genuine dispute that Soumis had specific intent to deceive the patent office absent any other evidence.

### 7.  *Forti Declaration*

Belvac also alleges that Crown engaged in inequitable conduct by submitting the declaration of Richard Forti to the PTO during the prosecution of the '784 Patent. Ex. 15 to Dkt. 132; Dkt. 146 at 17–18. It is not clear whether Belvac argues that Crown submitting the Forti declaration was in itself inequitable conduct or whether Crown submitting the Forti declaration is evidence of Crown's specific intent to deceive the PTO (Belvac's response brief to Crown's motion for summary judgment focuses almost exclusively on the 795 Necker, and only provides argument on the Forti declaration as evidence of intent (*see* Dkt. 146 at 17–18), but Crown's motion treats Belvac's arguments about the Forti declaration as an independent inequitable conduct allegation (*see* Dkt. 122 at 4–6)). Regardless, whatever Belvac's exact arguments about the Forti declaration are, they do not create a triable issue on inequitable conduct.

Richard Forti is the former Senior Vice President, Business Support, for Crown. Ex. 15 to Dkt. 132. Crown submitted Forti's declaration during the prosecution of the '784 Patent, and the declaration details Crown's business operations and the general market for necking machines. *Id.* The declaration also details Crown's knowledge (or lack thereof) of the 795 Necker, stating that "we could not find any specific information on the 795 Necker." *Id.* at ¶ 7.

Belvac's sole argument for why the Forti declaration is relevant at any stage of the inequitable conduct analysis is that "the Federal Circuit has held that the affirmative act of submitting an affidavit or declaration may support an inference of intent." Dkt. 146 at 17 (citing cases). But it is nonsense to say that submitting an affidavit or declaration *itself* is evidence of intent to deceive; it is submitting a *false or misleading* affidavit or declaration that can evince intent to deceive. *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1138 (Fed. Cir. 2007). And Belvac has not argued what, if anything, in the Forti declaration is false or misleading. Without more, the Forti declaration does not create a triable issue on inequitable conduct.

### 8.  Conclusion

In sum, there are three individuals in question who had a duty of candor to the PTO: Dunwoody, Scholey, and Soumis. There is no genuine dispute that Dunwoody and Scholey knew about the 795 Necker because Belvac has not put that evidence into the record. And, although Soumis knew about the 795 Necker, there is no genuine dispute that he knew of its materiality or that he had specific intent to deceive the PTO.

Therefore, the Court will grant Crown's motion on inequitable conduct, Dkt. 121.

### C.  Indefiniteness

### 1.  Background

Crown moves for summary judgment on indefiniteness, which Belvac has raised as an affirmative defense. Dkt. 123. Crown argues that Belvac has not created a triable issue on indefiniteness; specifically, Belvac argues that Crown cannot demonstrate the asserted patents fail to inform a person having ordinary skill in the art about the scope of the inventions. *Id.*

Belvac's indefiniteness defense relates to the term "enhancing concentricity" in some of the asserted claims. Belvac argued that this term was indefinite during claim construction,

although the Court adopted Crown's claim construction of the term. Dkt. 71 at 17–22. The Court

stated that it would revisit Belvac's arguments "at a later stage in litigation, once the record has

been more fully developed." *Id*. at 21.

Belvac now argues that the "enhancing concentricity" claim term is indefinite because a

skilled artisan would lack reasonable certainty in applying the term. Dkt. 149 at 3. First, Belvac

argues that the claims "do not describe the minimum distance a can body must move relative to

the die to cause the can body to center itself before the can body touches the die [transition]

portion, or exactly what the die's inlet shape must be in order for the can body to center itself

before the can body touches the die [transition] portion" based on the '982 Patent's statement

that "an inlet of the throat portion *may be* rounded." Dkt. 149 at 3–4 (quoting from '982 Patent).

Second, Belvac notes that "although the [] Patents provide several 'preferabl[e]' throat depths for

the claimed dies that allegedly 'improve the concentricity of the can end'—namely, 0.125 inches,

0.25 inches, and 0.375 inches—those throat lengths do not necessarily cause the can body to

center itself in the die before the can body touches the die transition portion." Dkt. 149 at 4.

## 2.  *Legal Standard*

To ultimately prevail on the merits of its indefiniteness defense, Belvac must prove by

clear and convincing evidence that the asserted "claims, read in light of the specification

delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572

U.S. 898, 901 (2014); 35 U.S.C. § 112. Definiteness is determined "at the time the patent was

filed." *Nautilus,* 572 U.S. at 908.

The Supreme Court has observed that "the certainty which the law requires in patents is

not greater than is reasonable, having regard to their subject-matter." *Id*. at 910 (internal

quotation marks omitted) (quoting *Minerals Separation v. Hyde*, 242 U.S. 261, 270 (1916)). That

is because the analysis "must take into account the inherent limitations of language" and because

"[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for

innovation.'" *Id*. at 909 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535

U.S. 722, 732 (2002)). The definiteness analysis looks to how "a skilled artisan would

understand the inherent parameters of the invention." *Biosig Instruments, Inc. v. Nautilus, Inc.*,

783 F.3d 1374, 1387 (Fed. Cir. 2015); *see also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,

806 F.2d 1565, 1576 (Fed. Cir. 1986). In other words, "definiteness is evaluated from the

perspective of a person of skill; requires a determination of whether such a skilled person would

understand the scope of the claim when it is read in light of the specification; and is evaluated in

light of knowledge extant in the art at the time the patent application is filed. It has long been the

case that the patent need not disclose what a skilled artisan would already know." *Dow Chem.

Co. v. Nova Chems. Corp.*, 809 F.3d 1223, 1224 (Fed. Cir. 2005).

Although indefiniteness is ultimately a question of law, the Court may only find

indefiniteness at the summary judgment stage if there is no genuine factual dispute underlying

the legal question. *See Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 Fed. App'x

858, 867 (Fed. Cir. 2019) (citing *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368,

1372 (Fed. Cir. 2003)).

### 3.   Analysis

Belvac argues that there is at least a jury issue on indefiniteness because the asserted

claims "disclose neither examples of throat lengths that would achieve full piloting in view of

certain die inlet shapes or stroke lengths, nor the objective variables a POSITA [person of

ordinary skill in the art] should consider to determine which throat lengths will achieve enhanced

concentricity in a given circumstance." Dkt. 149 at 9.

In turn, Crown argues that that Federal Circuit law allows claiming the dimensions of an invention with reference to what is necessary to accomplish a claimed goal rather than specific numerical figures. The Federal Circuit case on this proposition is *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986). In *Orthokinetics*, the patent claimed "a collapsible pediatric wheelchair which facilitates the placing of wheelchair-bound persons, particularly children, in and out of an automobile." *Id*. at 1568. Rather than reciting specific dimensions for the "front leg portion" of the wheelchair seat, the claim required that the "front leg portion is so dimensioned as to be insertable through the space between the doorframe of an automobile." *Id*. It was undisputed that applying the claims required "measur[ing] the space between the selected automobile's doorframe and its seat and then dimension[ing] the front legs of the travel chair so they will fit in that particular space in that particular automobile." *Id*. at 1576. The Federal Circuit rejected a challenge to the definiteness of the claim, explaining that "[t]he claims were intended to cover the use of the invention with various types of automobiles. That a particular chair on which the claims read may fit within some automobiles and not others is of no moment . . . The patent law does not require that all possible lengths corresponding to the spaces in hundreds of different automobiles be listed in the patent, let alone that they be listed in the claims." *Id.*

Belvac argues that *Orthokinetics* is inapposite because the patent in that case "provided the necessary variables from which the claimed 'dimensions' of the front legs of the travel chair 'could be easily obtained'" whereas here "the relevant variables are not disclosed" in the patents. Dkt. 149 at 12. Crown, however, argues that *Orthokinetics* is apposite because

> [l]ike the automobiles in *Orthokinetics*, beverage cans come in any number of shapes and sizes, and the neck dimensions of the beverage can depend on the can design and the

stage of necking. Thus, like the front leg portions in *Orthokinetics* that were "so dimensioned as to be insertable through the space between the doorframe of an automobile," it would have been a senseless exercise for the asserted patents to attempt to recite or claim all of the parameters necessary for "enhancing concentricity" in every situation. It was appropriate for the patents to rely on the competence of skilled artisans in determining the necessary parameters. *See Orthokinetics*, 806 F.2d at 1576 ("The patent law does not require that all possible lengths corresponding to the spaces in hundreds of different automobiles be listed in the patent, let alone that they be listed in the claims.")

Dkt. 124 at 13.

The Court notes that, while *Orthokinetics* is on-point in this case where the asserted patents claim what is necessary to accomplish a particular goal (i.e., "enhancing concentricity"), the procedural posture of *Orthokinetics* was an appeal from a judgment notwithstanding the verdict, where the jury returned a verdict that the asserted patent was invalid on indefiniteness, but the district judge granted JNOV regardless. *Orthokinetics*, 806 F.2d at 1575. The standard on appeal from a JNOV is that the appellant must show that there was "substantial evidence" to support the jury's findings and that those findings can support the jury's legal conclusions. *Id.* at 1571 (citing *Shatter-Proof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 619 (Fed. Cir. 1985)). Here, however, on summary judgment, the question is only whether there is a genuine dispute of material fact on the issue. *Bombardier*, 785 Fed. App'x at 867.

There is enough evidence in the record to create a triable issue on indefiniteness. In particular, there is evidence from witnesses, including expert witnesses Walsh and Gillest, which construed in the light most favorable to Belvac suggests that the throat lengths described in the specification of the '982 Patent as "preferabl[e]" to "improve the concentricity of the can end" (Ex. 2 to Dkt. 132 at 6:5–10) cannot in fact achieve full piloting, and thus would not "enhance concentricity" under the Court's claim construction. The Court notes these pieces of evidence in the record, viewed in the light most favorable to Belvac:

19

- Crown's technical manager, Daniel Egerton, testified that the length of the throat portion of the dies in the second stage of Crown's 3400 necking machine were approximately 0.86 inches and that he could not be sure that the same die would be capable of "full piloting" if the throat portion were reduced to 0.25 inches, as described in the asserted patents. *See* Ex. C to Dkt. 149 at 346:9-347:8, 349:4-14, 363:21-364:25, 365:11-366:5.

- The supervisor of Crown's tooling development, Kevin Ambrose, also testified that he did not know whether a die with a throat length of 0.125 inches would allow full piloting, at least at the speeds claimed by the asserted patents. *See* Ex. E to Dkt. 149 at 31:1-19, 155:22-156:2, 156:15-21, 157:8-158:2.

- Crown's technical expert, Robert Walsh, acknowledged that the throat lengths disclosed in the Dunwoody Patents "are relatively short," and that "simply knowing a throat depth of a die does not tell you whether a die will enhance concentricity." Ex. F to Dkt. 149 at 131. Mr. Walsh also stated that "for the standard 211/202 necking process that has been the focus of much of this case, a throat length of exactly 0.125, 0.25, or 0.325 inches would likely be insufficient to enhance concentricity as a general matter." *Id*. at 133. Mr. Walsh further testified during his deposition that full piloting requires the ability to full pilot a can body at every stage of the necking process, which was not possible with throat lengths of 0.125, 0.25, or 0.375 inches. Ex. G to Dkt. 149 at 193:21-195:23, 196:18-197:1.

- Belvac's expert Edmund Gillest testified that at 0.125, 0.25, and 0.375-inch throat lengths a necking die could not achieve full piloting at the claimed throughput speeds. Ex. H to Dkt. 149 at 23:2-24:17, 81:1-82:22; Ex. I to Dkt. 149 at 1.

There is at least an imaginable scenario, then, where Belvac could show that the asserted patents fail to inform a person of ordinary skill in the art what the scope of the inventions are.

The Court notes that its decision here is not inconsistent with its prior claim construction order, where the Court deferred ruling on indefiniteness until the record had been more fully developed. Dkt. 71 at 12. Here again, the Court simply holds that this is not the right stage of the process to settle the indefiniteness issue, because the evidence now in the record, viewed in the light most favorable to Belvac as the non-moving party, creates a genuine dispute of material fact.

Therefore, the Court will deny Crown's motion on indefiniteness, Dkt. 123.

D.   No Derivation

Crown moves for summary judgment on Belvac's affirmative defense of derivation. Dkt.

127. Crown contends that Belvac cannot establish the essential elements of derivation under 35

U.S.C. § 102(f).

*1.   Legal Standard*

Under pre-AIA 35 U.S.C. § 102(f), a patentee is not entitled to a patent if "he did not

himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (2006). "This is a

derivation provision, which provides that one may not obtain a patent on that which is obtained

from someone else whose possession of the subject matter is inherently 'prior.'" *OddzOn Prod.,*

*Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1401 (Fed. Cir. 1997). This provision "invokes the familiar

requirement that a challenger asserting this ground show that there was a 'prior conception of the

claimed subject matter and communication of the conception' to the named inventor."

*Cumberland Pharms. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017)

(quoting *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993)). The Federal Circuit has found

that "subject matter derived from another not only is itself unpatentable to the party who derived

it under § 102(f), but, when combined with other prior art, may make a resulting obvious

invention unpatentable to that party under a combination of §§ 102(f) and 103." *OddzOn*, 122

F.3d at 1403–04.

*2.   Analysis*

Belvac's derivation argument is based on its allegation that the CMB 3400 is derived

from technology that Belvac developed, and thus that Crown's patents relating to the CMB 3400

are derived from technology that Crown did *not* develop, and are thus invalid. Dkt. 148 at 8.

Specifically, Belvac alleges that Crown was aware of the technology used in Belvac's 595SK

21

machine, then claimed that technology as its own and filed patents on it. *Id.* at 2. Belvac invented

the 595SK sometime in the 1990s. *Id.* Belvac alleges that Crown then relied heavily on the

technology in the 595SK in developing the claimed invention, the CMB 3400. *Id.* at 4.

Specifically, Belvac lists these features of the 595SK as being later patented by Crown: high

speed necking, die tooling with longer throat lengths, longer stroke pusher technologies, and

winder assembly for manually rotating turrets. *Id.* at 4–6.

Crown construes Belvac's argument as being based in "obviousness."  Indeed,

"derivation is not proved by showing conception and communication of an idea different from

the claimed invention where that idea would make the claimed idea obvious." *Cumberland*, 846

F.3d 1219 (citing *Gambro*, 110 F.3d at 1577–78). The basic idea behind the obviousness doctrine

is that there is no "derivation" bar when the underlying technology is "obvious," so Crown's

claim here is that whatever technology Belvac asserts that Crown took in developing the CMB

3400, the technology was "obvious." And obviousness cannot give rise to a derivation claim.

*Cumberland*, 846 F.3d at 1218.

But Belvac notes that it is "not asserting a stand-alone anticipation defense under

§ 102(f), but is instead asserting the 595SK (and related 595K), which is prior art under § 102(f)

based on all the overwhelming evidence in the record, renders the Asserted Claims obvious

under § 103(a)." Indeed, although a derivation claim based on obviousness may not hold under

just § 102(f), it may under the combination of §§ 102(f) and 103(a). *See Milwaukee Elec. Tool

Corp. v. Snap-On Inc*., 2017 WL 4570787 at *3 (E.D. Wis. Oct. 12, 2017) (noting that cells

could qualify as prior art under § 102(f) even if they could not sustain a derivation defense on

their own where "[t]he text of Section 103(a) confirms that even if certain prior art references fall

short of invalidating a patent when considered under the relevant subsection of Section 102, they

nevertheless can be used to make out an obviousness challenge."); *Onyx Therapeutics, Inc. v. Cipla Ltd.*, 2020 WL 2214443 at *32 (D. Del. May 4, 2020) ("Prior art under § 102(f) can be used to show obviousness"), aff'd, 839 F. App'x 545 (Fed. Cir. 2021).

Belvac's argument, then, is that the 595SK was both "prior art" under § 102(f) *and* that "the differences between" Crown's invention and the 595SK were "such that the claimed invention as a whole would have been obvious before the effective filing date" under § 103(a). The Federal Circuit's cases support the proposition that Belvac can so combine §§ 102(f) and 103(a) to overcome a summary judgment motion on derivation. *See Oddzon*, 122 F.3d at 1403 (holding that under § 103(a), "an invention, A', that is obvious in view of subject matter A, derived from another, is also unpatentable. The obvious invention, A', may not be unpatentable to the inventor of A, and it may not be unpatentable to a third party who did not receive the disclosure of A, but it is unpatentable to the party who did receive the disclosure" and thus that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103.").

The Court must, then, determine whether there is sufficient evidence in the record to create a genuine dispute of material fact on whether the 595SK was in fact "prior art" and that the differences between the CMB3400 and the 595SK were such that the claimed invention would have been obvious before the effective filing date. There is. With respect to prior art, it is undisputed that Belvac first sold the 595SK in the United States in 1996, twelve years before the filing date on the asserted claims. Dkt. 186 at 2; Dkt. 148 at 11. Expert witness Edmund Gillest's opinion on the matter compared the key features of the 595SK with the asserted claims, including (1) the pusher assembly with a stroke length of at least 1.5 inches, (2) the multiple

horizontal necking stages adapted for necking at least 3,000 cans per minute, (3) the dies with throat depths of at least 0.125 inches, and (4) the winder assembly for manually rotating the multiple stages of the machine. Ex. 5 to Dkt. 148 at ¶¶ 291–292, 302–313, 313–317, 519–520. Several fact witnesses have testified in depositions that Belvac obtained patents on the 595SK. Ex. 2 to Dkt. 148 at 81:17–19; Ex. 3 to Dkt. 148 at 49:14–51:2; Ex. 4 to Dkt. 148 at 94:6–10.

With respect to Crown's knowledge of the prior art, there is evidence in the record that features of the asserted claims were communicated to Crown's inventors. Gillest's report suggests that Crown acquired Belvac's necking dies for the 595SK during the development of the CB4300. Ex. 50 to Dkt. 148 at ¶ 571; *see also id.* at ¶¶ 249, 253, 321, 324, and 449 (where Gillest describes other communications between Crown and Belvac). Other examples in the record of communication of the features of the 595SK to Crown include:

- A March 2004 memorandum that Belvac alleges was shared with a named inventor documenting the throughput speed of the 595 SK at 3,200 cans per minute. Ex. 9 to Dkt. 148; Ex. 10 to Dkt. 148 at 231:12–20; Ex. 11 to Dkt. 148.

- July 2004 meeting notes from a meeting with a named inventor discussing the 595SK's use of twelve necking pockets per turret. Ex. 21 to Dkt. 148.

- A July 2004 report from Crown's inspection of a 595SK, which was shared with Crown inventors, along with a discussion of the pusher assembly drawings from the 595. Ex. 22 to Dkt. 148; Ex. 10 to Dkt. 148 at 251:9–254:8.

- Pictures from a December 2004 inspection of a 595, which was attended by a Crown engineer and includes pictures of the hand wheel. Ex. 19 to Dkt. 148; Ex. 10 to Dkt. 148 at 134:24–137:15.

- Pictures from a July 2005 inspection of another 595, which was attended by Crown engineers and include photos of the turrets on the 595. Ex. 5 to Dkt. 148; Ex. 23 to Dkt. 148.

Viewed in a light most favorable to Belvac as the non-moving party, this evidence is sufficient to create a genuine dispute of material fact on derivation.

Therefore, the Court will deny Crown's motion for summary judgment on the issue.

24

### E.   NC-10 Necker

*1.  Background*

Crown's next summary judgment motion, Dkt. 128, relates to the Reynolds NC-10 Necker, a necking machine invented by a third party in the 1980s that Belvac alleges had the same front-side "winder assembly" that Crown later claimed in the '425 Patent. Belvac has raised an affirmative defense relating to the NC-10 Necker. If Belvac could show at trial that the NC-10 Necker was publicly known and on sale before the '425 Patents priority date, then Belvac could show that Crown does not have a valid patent. Crown argues that Belvac could not possibly show this, however, because there is "no evidence . . . of prior public knowledge or publicly-accessible use of the machine." Dkt. 129 at 1.

Belvac alleges that the NC-10 was a multi-stage necking machine that was manufactured by Reynolds Metals Company at its Can Division plant near Richmond, Virginia beginning in the 1980s. Dkt. 143 at 3. The NC-10 was a rotary necking machine that necked down the open end of a can in multiple stages. *Id*. The NC-10 shared several features with the invention claimed in the '425 Patent, including:

- The NC-10 was a horizontal necking machine with multiple necking stages, where each stage included a rotatable turret on the front of the machine. Ex. 5 to Dkt. 143 at 28:13–29:2, 30:15–32:2; Ex. 4 to Dkt. 143.

- The NC-10 had a motor and a gear train located on the rear of the machine (the side of the machine opposite the turrets). Ex. 5 to Dkt. 143 at 26:2–9, 32:19–24.

- The NC-10 had a winder mechanism located on the front of the machine. *Id*. at 25:8–26:9; Ex. 4 to Dkt. 143; Ex. 6 to Dkt. 143.

- The hand wheel on the NC-10 was for manually rotating the various necking stages of the machine. Ex. 5 to Dkt. 143 at 49:10–50:5.

Belvac has provided evidence that around the 1980s, Reynolds sold necking equipment to several customers, including Miller Brewing. Ex. 5 to Dkt. 143 at 17:20–18:7. The NC-10

Operations Manual indicates that the NC-10 Necker was prepared specifically for a "customer." Ex. 4 to Dkt. 143. Reynolds' sales records show at least eighteen sales of the NC-10 between 1981 and 1993. Ex. 9 to Dkt. 143.

Crown's own technical expert, Robert Walsh, admitted that he was aware of the NC-10 "in the mid-80s," and that Reynolds offered it for sale at that time. Ex. 10 to Dkt. 143 at 316:10–21. Similarly, Edmund Gillest, Belvac's technical expert, testified that he saw an NC-10 at a Reynolds plant in the mid-90s, and testified that a former employer of his owned at least one NC-10 machine. Ex 11 to Dkt. 143 at 107:14–108:12. Belvac also offers that several fact witnesses have knowledge of the NC-10 from the early 90s. *See* Ex. 12 to Dkt. 143 at 38:11–18; Ex. 13 to Dkt. 143 at 14:4–6; 242:17–243:7.

## 2.  *Legal Standard*

In relevant part, 35 U.S.C. § 102(a) operates to invalidate a patent claim if the claimed subject matter was "known or used by others in this country. . . ." 35 U.S.C. § 102(a). "Known or used by others" in this section requires public knowledge or use—specifically, "knowledge or use which is accessible to the public." *See Carella v. Starlight Archery & Pro Line Co*., 804 F.2d 135, 139 (Fed. Cir. 1986) ("The statutory language, 'known or used by others in this country' [under § 102(a)] means knowledge or use which is accessible to the public."); *BASF Corp. v. SNF Holding Co*., 955 F.3d 958, 964-965 (Fed. Cir. 2020) ("This court has uniformly interpreted the 'known or used' prong of § 102(a) to mean 'knowledge or use which is accessible to the public.'") (quoting *Carella*, 804 F.2d at 139).

Under 35 U.S.C. §§ 102(a) & (b), when determining whether a prior knowledge or use constitutes invalidating prior art, the Court should consider factors such as "the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and]

26

whether there was any confidentiality obligation imposed on persons who observed the use."

*Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013). This finding is fact-specific. The Federal Circuit has stated "[e]ven limited disclosure to those who are skilled enough to know, understand, and 'easily demonstrate the invention to others,' may mean there was no reasonable expectation of secrecy and that the invention was therefore in public use." *Id*. at 1355–56 (quoting *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002)). Finally, the Federal Circuit has held that when determining whether an invention was publicly used, "[o]ur precedent is clear that a factfinder should consider whether certain elements of the claimed invention were already in the public domain at the time of the alleged public-use or on-sale activity." *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 966-67 (Fed. Cir. 2020) (rejecting the notion that a finding of public use "requires a finding that the public was made aware of every limitation of the claimed process").

Under 35 U.S.C. § 102(g), a patent may be invalidated if "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). According to the Federal Circuit, "a challenger . . . has two ways to prove that it was the prior inventor: (1) it reduced its invention to practice first . . . or (2) it was the first party to conceive of the invention and then exercised reasonable diligence in reducing that invention to practice." *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012) (quoting *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001)).

### 3.   *Analysis*

There is a dispute of material fact on each of the contested elements of the affirmative defense: (1) whether the NC-10 was "publicly known" and (2) whether it was "on sale" prior to

27

when Crown applied for the '425 Patent.[3] For public knowledge, the Court points to the numerous pieces of evidence that Belvac has put forward where several individuals have discussed their knowledge of the existence of the NC-10. *See* Ex. 10 to Dkt. 143 at 316:10–21 (Walsh deposition, stating that he had seen a NC-10 in the late 90s or early 2000s); Ex 11 to Dkt. 143 at 107:14–108:12 (Gillest deposition, stating that he had seen a NC-10 at a Reynolds plant in the 90s and at a plant he used to work at). For sales, the Court points to the evidence in the record where witnesses have said that they were aware that that Reynolds had sole the NC-10 in the 90s and 2000s, and the evidence in the record that the NC-10 was actually on sale. *See* Ex. 12 to Dkt. 143 at 38:11–18 (Terry Babbitt deposition, stating that Reynolds was selling neckers to other can makers in the early 90s); Ex. 13 to Dkt. 143 at 14:4–6; 242:17–243:7 (Joe Schill deposition, stating that he had seen a brochure for the NC-10 in the early 90s); Ex. 9 to Dkt. 143 (sales records of the NC-10 first dating from the late 1980s). In short, then, there is evidence in the record that the NC-10 was "publicly known" and "on sale" prior to when Crown filed its application or the '425 Patent.

Therefore, the Court will deny Crown's motion on the NC-10 Necker, Dkt. 128.

### F.  On-Sale Bar

Both parties have moved for summary judgment on the issue of the on-sale bar clause of the pre-AIA 35 U.S.C. § 102(b). Dkt. 117, 125. Belvac contends that all four asserted patents are invalid because Crown allegedly offered to sell the CMB 3400 in the United States more than one year before the earliest priority date of the patents, purportedly invoking the "on sale bar" of

---

[3] Crown applied for the '425 Patent in April 2008. Ex. 1 to Dkt. 143. There is some dispute in the briefs about whether the relevant date is then, in April 2008, or in July 2006, the earliest priority date of the claimed invention of the '425 Patent, *see* Dkt. 143 at 2, n. 2, but the analysis is the same regardless of which date is the benchmark, since the evidence in the record about the NC-10 all dates to the late 80s and 90s.

the pre-AIA 35 U.S.C. § 102(b). Dkt. 117. Crown argues that Belvac cannot demonstrate that the price quotation in question constitutes a commercial offer for sale that was made in the United States, as required by Federal Circuit law. Dkt. 125.

The on-sale bar clause of the pre-AIA 35 U.S.C. § 102(b) states that a patentee's "voluntary act or acquiescence in the public sale and use [of its invention] is an abandonment of his right [to a monopoly over that invention]." *Pfaff v. Wells Elecs., Inc*., 525 U.S. 55, 64 (1998). "[T]he on-sale bar . . . reflects Congress' 'reluctance to allow an inventor to remove existing knowledge from public use' by obtaining a patent covering that knowledge." *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 586 U.S. __; 139 S.Ct. 628, 632 (2019) (citing *Pfaff*, 525 U.S. at 64).

Because Crown filed the applications for the Asserted Patents before March 16, 2013, pre-AIA 35 U.S.C. § 102(b) governs the validity of the Asserted Patents under the on-sale bar. See Pub. L. No. 112-29 § 3(n), 125 Stat. 284, 293 (2011) ("Except as otherwise provided in this section, the amendments made by this section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this act [i.e., September 16, 2011]."). To that end, pre-AIA § 102(b) provided that "[a] person shall be entitled to a patent unless . . . (b) the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States [i.e., the 'critical date']."

Belvac argues that Crown offered to sell a CMB3400 necking machine in November 2006, prior to obtaining the asserted patents on the machine, and that the offer to sell triggers the on-sale bar clause. Dkt. 118 at 5–6, 11–15. The only disputed question is whether the offer was sufficient to constitute an offer to sell under Federal Circuit case law; the parties agree that if it was, it triggers the on-sale bar clause. *See* Dkt. 118 at 2; Dkt. 126 at 1–2. The parties simply

disagree whether the purported "offer" was really an "offer" within the meaning of Federal Circuit law.

Federal Circuit law applies in determining whether an alleged on-sale activity rises to the level of a commercial offer for sale that triggers the on-sale bar. *Medicines Co. v. Hospira, Inc*., 827 F.3d 1363, 1373 (Fed. Cir. 2016) (en banc). There is no requirement that the sale be completed to trigger the on-sale bar; rather, "evidence of an offer to sell is sufficient to trigger the on-sale bar under 35 U.S.C. § 102(b)." *Cargill, Inc. v. Canbra Foods Ltd.*, 476 F.3d 1359, 1370 (Fed. Cir. 2007). The Federal Circuit defines an offer for sale as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed. Cir. 2001). There is no offer if the recipient "knows or has reason to know that the person making it does not intend to conclude the bargain." *Id*. Accordingly, to constitute an offer for sale, a proposal or attempt to sell must be "sufficiently definite that the other party could make a binding contract by simple acceptance." *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc*., 726 F.3d 1370, 1374 (Fed. Cir. 2013); *see also Linear Tech*., 275 F.3d at 1048; *Group One, Ltd. v. Hallmark Cards, Inc*., 254 F.3d 1041, 1048 (Fed. Cir. 2001).

The "offer" was made from a sales representative of CarnaudMetalbox Engineering Ltd. (a subsidiary of Crown that is also a plaintiff in this case) to a company called Complete Packaging Machinery. Ex. 10 to Dkt. 118. The "offer" lists the item as a "3400 Necker" with a brief description of its components. *Id.* Under a section titled "Delivery," the "offer" notes that the machine would be "[p]acked, ready for dispatch 30 weeks from receipt of order" and includes what the recipient would need to include in an order. *Id.* Most notably, the "offer" states that it is merely a quotation, and that "[q]uotations are valid for sixty days only and are subject to

our written acceptance of your order." *Id.*

The offer was not sufficiently definite to constitute an "offer" under Federal Circuit law. In order to constitute an "offer" for the purposes of the on-sale bar clause, Crown's "offer" must have created the power of acceptance in the recipient. *Hamilton Beach*, 726 F.3d at 1376 ("[A] commercial offer for sale under § 102(b) is one which [] the other party could make into a binding contract by simple acceptance."). On the face of it, Crown's quotation did not allow the recipient to create a binding contract by acceptance—it was an invitation to make an offer, not an offer in itself. Belvac argues that the quotation was in fact an "offer" for the purposes of the on-sale bar clause because Crown's "written acceptance" was a "merely a formality," but has not cited any authority that would lead the Court to overlook such an express reservation of the right to accept an offer as was in Crown's quotation. *See* Dkt. 118 at 14. The two cases that Belvac cites—*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356 (Fed. Cir. 2017) and *The Meds. Co. v. Hospira, Inc. ("Mediciens II")*, 881 F.3d 1347 (Fed. Cir. 2018)—are inapposite, because while in both of those cases the Federal Circuit overlooked similar "written acceptance" clauses and applied the on-sale bar clause, both of those cases involved a separate agreement between the buyer and seller that obliged the party who had drafted the "written acceptance" clause to accept the contract. No such agreement existed here—there is no evidence in the record to suggest a prior relationship, or any other kind of dealing, between the offeror and offeree.

In short, under Federal Circuit law, the purported "offer" was not an offer for the purposes of the on-sale bar clause. It was merely a quotation. Therefore, the Court will grant Crown's motion for summary judgment on the on-sale bar clause and deny Belvac's motion.

31

### G.   Lack of Written Description

Belvac moves for summary judgment on validity of the patents under pre-AIA 35 U.S.C.

§ 112.[4] Dkt. 117. Belvac argues that Crown's patents are invalid as a matter of law under the pre-

AIA 35 U.S.C. § 112. Specifically, Belvac argues that Crown's written description of the patents

is too indefinite to render the patents valid. Dkt. 118 at 20–21. Belvac claims that Crown's

patents assert to cover two different processes: "a can being pushed into a diem, and a die being

pushed into a can." *Id.* at 20. Belvac continues:

> Because the specifications do not mention, much less describe, an apparatus where the
> die is pushed onto a can, the specifications do not support the claims as Crown now
> attempts to enforce them. As a matter of law, then, the asserted claims of the '570, '982,
> and '784 Patents . . . violate the written description requirement of pre-AIA 35 U.S.C. §
> 112, ¶ 1 and are thus invalid[.]

*Id.* at 20. In essence, Belvac's argument is that Crown's patents claim ownership of two different

processes, but only describe one—which renders the patents invalid.

The written description requirement stems from § 112, ¶ 1 of the Patent Act, which

provides that "[t]he specification shall contain a written description of the invention, and of the

manner and process of making and using it, in such full, clear, concise, and exact terms as to

enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C.

§ 112, ¶ 1. The written description must clearly allow persons of ordinary skill in the art to

recognize that the inventor invented what is claimed. *Ariad*, 598 F.3d at 1351. The test for

sufficiency is whether the disclosure "reasonably conveys to those skilled in the art that the

inventor had possession of the claimed subject matter as of the filing date." *Id*.

Because written description is a fact question, Belvac must show that no reasonable fact

---

[4] As discussed above in Part III.C., Crown also moved for summary judgment on this
issue. The Court addresses the issues raised in Crown's motion in that section and the issues
raised in Belvac's motion here.

finder could return a verdict for Crown. *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (reversing summary judgment of no written description). Thus, Belvac must show that no reasonable jury could conclude that the patents "reasonably convey[] to those skilled in the art that the inventor[s] had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)

Belvac argues—and Crown concedes—that Crown's patents do not contain an example of a necking machine where the die moves onto a stationary can, as happens with THE BELVAC. Dkt. 118 at 20–40; 151 at 16–17. Belvac cites to the Federal Circuit case of *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005), which held that a patentee may not be able to "support[] expansive claim language, merely by describing one embodiment of the thing claimed." That case is apposite, Belvac argues, because here Crown is claiming patent ownership of two kinds of processes while only having described one. Dkt. 118 at 23, 36–37.

In turn, Crown argues that a single example can be, and often is, sufficient for the written description requirement. Indeed, "there is no categorical rule that a species cannot suffice to claim the genus." *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011) (affirming denial of JMOL of lack of written description). Rather, "so long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description." *Id*. In addition, Crown notes that "there is much more to written description than the specification of the patents." Dkt. 151 at 19. The Federal Circuit's case setting out the factors for the written description requirement is *Capon v. Eshar*, 418 F.3d 1349, 1357–58 (Fed. Cir. 2005) (adopted en

33

banc in *Ariad*, 598 F.3d at 1351). The Federal Circuit has explained that it could not "predict and adjudicate all the factual scenarios to which the written description requirement could be applied" and would not "set out any bright-line rules." *Id*. Thus, Crown argues, the determination of whether it met the written description requirement cannot be boiled down to such a simple analysis as whether it claimed ownership of two processes while only adequately describing one.

Finally, Crown argues that "the written description requirement may be met with less disclosure when the feature of interest is not critical." Dkt. 151 at 20. The law requires written description of the claim as a whole—however, "the criticality or importance of an unclaimed limitation to the invention can be relevant to the written description inquiry." *In re Global IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019) (relying on Peters, 723 F.2d at 893-94). Here, Crown argues, the difference between whether the can or the die is the part of the machine that moves (the two different processes) is of non-critical importance. Dkt. 151 at 23–24.

Put simply, this is a jury issue. Belvac has not offered any authority that the Court may grant summary judgment on the written description requirement solely because Crown's specifications do not describe the precise process in question (a die pushing into a can). The standard is whether the description "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date," *Ariad*, 598 F.3d at 1351, and it is possible to meet that standard even where the patent does not describe the claimed process in detail. *See Hynix*, 645 F.3d at 1352.

Therefore, the Court will deny Belvac's motion with respect to the written description.

### H.   Lost Profits

Belvac moves for summary judgment on lost profits, arguing that Crown's request for lost profits "should be rejected as a matter of law because Crown has admitted that it did not

have the manufacturing capability to make the sales Belvac made." Dkt. 117. The argument largely tracks the same arguments that Belvac makes with respect to its motion to exclude expert witness Walsh's opinion on lost profits damages, discussed in the Court's accompanying opinion on the parties' *Daubert* motions.

In order to obtain lost profits at trial, Crown must show that but for the alleged infringement, it would have made the sales that Belvac made. *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (holding that to prove entitlement to lost profits damages, the patentee needs to show "a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer."). A reasonable probability is sufficient, and certainty is not needed. *Id*. ("A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement.").

Belvac argues that a statement in expert witness Trexler's opinion negates the possibility of Crown recovering lost profit damages. Dkt. 118 at 43. Trexler noted in her report that Crown "lacked . . . the floor space to set up the production line to meet the additional capacity that would have been needed to make the sales in the 'but for' world in 2018." *Id.* This, Belvac argues, means that "Crown did not have the capacity to meet the demand, [and so] Crown cannot show that 'but for' the infringement, it would have made the sales Belvac made." *Id.*

Crown argues that Belvac mischaracterizes Trexler's report. Crown notes that the part of Trexler's report about Crown's floor space only meant that Crown might not have been able to meet the demand for the profits lost to Belvac given Crown's then-amount of floor space. But, Crown argues, if it had demand for more machine orders, it simply would have leased more floor space. *See* Dkt. 151 at 34–36. Crown notes that Belvac was its only competitor, so the orders that Crown lost to Belvac due to the alleged infringement very likely would have gone to Crown but

for the infringement. *Id.* at 36.

Belvac has pointed to just one piece of evidence that Crown is not entitled to lost damages—Trexler's comment about floor space. But the line from Trexler's report does not even clearly suggest that Crown could not have possibly met the demand it would have had if not for Belvac's alleged infringement. It only really suggests that Crown would have needed more floor space to do so. And, even if Trexler's statement is true, it is just one piece of evidence—it does not mean that there is no dispute on the matter.

Therefore, the Court will deny Belvac's summary judgment motion with respect to lost profits.

### IV.   Conclusion

The Court will issue an accompanying order summarizing the outcomes of each motion discussed in this memorandum opinion.

The Clerk of Court is directed to send a copy of this opinion to all counsel of record.

Entered this ___17th___ day of March 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE